Filed 5/21/13  P. v. Jackson CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>DEMORIA RANDOLPH JACKSON et al.,<br><br>　　　　Defendants and Appellants. | B231839<br><br>(Los Angeles County<br>Super. Ct. No. TA087375) |

　　　　APPEALS from judgments of the Superior Court of Los Angeles County, David Sotelo, Judge.  Affirmed as modified.

　　　　Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant Demoria Randolph Jackson.

　　　　Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant Devin Caress Murphy.

　　　　Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Margaret E. Maxwell, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants Demoria Randolph Jackson and Devin Caress Murphy appeal from the judgments entered following their convictions by jury of first degree murder and attempted willful, deliberate, and premeditated murder, with findings that each defendant and a principal personally discharged a firearm which proximately caused great bodily injury or death to the victims and that the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang.[1] (Pen. Code, §§ 187, subd. (a), 664, 187, subd. (a), 12022.53, subds. (b), (c), (d) & (e)(1), 186.22, subd. (b)(1)(C).)[2] After a court trial, each defendant was found to have suffered a prior serious felony conviction within the meaning of sections 667, subdivisions (b)-(i), 1170.12, subdivisions (a)-(d) (collectively, the "Three Strikes" law), and 667, subdivision (a). Each defendant was sentenced to 119 years to life.

Defendants contend their speedy trial rights were violated, heavy police presence in the courtroom denied them a fair trial, and they are entitled to additional presentence custody credits. Jackson also alleges the prosecutor's excessive use of his gang moniker and the admission of Murphy's out-of-court statements denied him a fair trial, the trial court's failure to admit exculpatory hearsay statements denied him a right to present a defense, and cumulative error warrants a new trial. Murphy urges that if the judgments are affirmed, liability under the court's direct restitution order must be made joint and several.[3]

We will direct the superior court to amend each defendant's abstract of judgment and, as modified, affirm.

---

[1] Defendants were convicted in an earlier trial; however, the court granted their motion for a new trial due to prosecutorial misconduct. Although both were represented by counsel at the first trial, they elected to represent themselves at the trial under review in this appeal.

[2] All further undesignated statutory references are to the Penal Code.

[3] Each defendant joined in the arguments raised by the other.

# STATEMENT OF FACTS

## I.  The Prosecution Case

On February 19, 2002, at approximately 9:30 p.m., Tarasha Patterson went to visit a friend on Cairn Avenue.  As she parked, Patterson noticed a small white car across the street.  There were two African-American males sitting in the car, which had its windows down.  Patterson did not get out of her car immediately, as she was wary of the two males, who appeared to be waiting in their vehicle for no apparent reason.  After waiting for approximately 10 to 15 minutes, she exited and went into her friend's house.  After another 10 minutes, Patterson realized she had forgotten something in her car.  As she started out of the house, she looked out of the window and noticed the white car was still parked.  She began to turn the doorknob when she heard gunshots.  Patterson ducked down.  When she looked up, she saw the white car driving away.

Patterson noticed two people who appeared to have been shot.  A female was lying on the grass and a male was crouched down at the passenger side of Patterson's car.  Patterson went over to the female and observed that she had been shot in the head.  The male had a gunshot wound to his leg.

Cheweakii Ethrieg and her boyfriend were sitting in a car on Cairn Avenue.  She heard multiple gunshots coming from somewhere behind her.  Ethrieg and her boyfriend ducked down.  When she got up, she saw a small white car driving past.

Los Angeles County Sheriff's Department Sergeant Bradd Molner was on patrol when he received a call regarding a gunshot victim.  When he arrived at the scene of the shooting, he saw the female victim, Linda Mixon, and the male victim, Roland Bolton.  Bolton was sitting on the curb.  Paramedics arrived, began treating a wound on Bolton's upper thigh, and transported him to the hospital.  Mixon was lying on her stomach and appeared to have a gunshot wound in the back of her head.  She was pronounced dead at

3

the scene.[4]  Sergeant Molner determined that both victims were in their 40's.  At the site of the shooting, eight .45-caliber and 6 nine-millimeter shell casings and one expended bullet were recovered.

Detective Boyd Zumwalt spoke to Bolton at the hospital.  Bolton had been shot multiple times and was an uncooperative witness.  Zumwalt believed the shooting was gang related because witnesses in such incidents do not want to talk to the police.  Zumwalt later served Bolton with a subpoena to appear at the prior trial and he failed to appear.  Subsequently, Bolton was unable to be located.  He did not testify at any court proceeding.

On March 17, 2002, Deputies Jeffrey Houle and his partner James Whitmore went to the residence of Vertis Nevens, located on West Cypress Street in the City of Compton.  The home is approximately one mile from the location where Mixon and Bolton were shot.  While there, Houle and his partner ran the license plate of a parked vehicle occupied by Sirone Edmond and Lederrick Jones.  After the plate came back to a different car, Houle got out to investigate.  Edmond and Jones exited their vehicle.  With their hands on their waistbands, they walked into Nevens's home.[5]

Later, after Edmond and Jones were detained, Nevens's house was searched.  In his bedroom, the deputies located rifles, BB guns, a loaded .38-caliber revolver, a loaded .45-caliber handgun, rounds of ammunition, and photographs.  Deputy Houle testified that one of the photographs depicted Nevens holding the .45-caliber handgun that was later determined to be one of the murder weapons.  The Nevens home is known as a Tragniew Park Crips gang stronghold.  Several members were jumped into the gang at that residence, others were sent on gang missions from that location, and the home was used as a gathering place for the gang.  The gang also stored its weapons at the house.

---

[4]     A deputy medical examiner testified that Mixon died as a result of sustaining multiple gunshot wounds.  Bullets were recovered from Mixon's body and her clothing.  Two bullets were nine-millimeter rounds and two were .45-caliber rounds.

[5]     Jones admitted at trial that he was one of the individuals who went into the residence, but denied he was armed.

4

At the time of trial, Lederrick Jones was serving a 15-year sentence for voluntary manslaughter for his participation in a prior shooting. He testified against two others who were involved in that incident. Jones decided to testify in the present case because he learned the victim was an innocent bystander and it was "something . . . on [his] chest" and he "just wanted to get it off." He received no benefit for his current testimony, although the detective promised to help relocate Jones's family, as Jones feared retaliation.

Jones was a member of the Tragniew Park Crips. He went by the name of Little Slack or Little Bro. There were different generations within the gang, one of which was the BGs, or Baby Gangsters. Jones had known defendants for a number of years. They were older members of the gang and part of the BGs generation. Jackson was known as Time Bomb and Murphy's moniker was Stutter Box. Defendants were close. Jones described them as "road dogs," meaning that "when you see one[,] you see the other."

On February 19, 2002, the night Mixon and Bolton were shot, Jones was with defendants at Vertis Nevens's house. Nevens is also a Tragniew Park Crip, who goes by the name of Little Q-Ball. Also present were C-Rag, Snake, and Blue Jay. People were smoking and drinking. Jones drank beer and cognac and smoked marijuana and PCP. He was feeling the effects of the PCP. Glenn Jefferson, also known as Little Jack Dog, drove up in a white Ford Escort. Jefferson was carrying a nine-millimeter Glock handgun for protection, as he was dealing drugs at the time and carried large sums of money. He began smoking PCP with the others.

Jefferson took the gun from his side and was going to put it in his jacket pocket. Jackson asked to see the gun and took it from Jefferson. While holding the gun, Jackson said, "We're going to fuck up the one time tonight, and bust up on the Campanellas." Murphy, who was standing next to Jackson, said nothing. According to Jefferson, Jackson meant that they were going to make problems for the police and shoot a Campanella Piru member. The Campanellas were enemies of the Tragniew Park Crips.

Jones left the home with some others, including Blue Jay, and went to the park. When Jones returned, Jefferson was angry because someone had taken the Ford Escort

5

and his nine-millimeter handgun.[6]  Defendants and the Ford were no longer at Nevens's house.  A few minutes later, defendants returned and Jackson said to Jones, "I got a slob bitch and a slob nigger."  Jones knew that "slob" was a disrespectful term for a Blood gang member.  Murphy stated, "The BG's with the business."  Jones stated this meant defendants put in some work for their gang on some rival Bloods.  Defendants said they lured the victims toward their car by saying, "Hey, Blood."  Jones saw Murphy with a .45-caliber gun in his waistband.

Jefferson asked where his gun was.  Jackson responded, "I just domed a mother fucker.  I got blood all over me."  Jefferson said this meant that Jackson had shot someone in the head.  Murphy was standing next to Jackson when he made the statement and said nothing.  Jefferson and Jackson began arguing.  Jackson snatched a gold chain from Jefferson's neck.  Jefferson took off his jacket and the two men went outside and started fighting.  Jackson told another gang member that they were going to pull Jefferson to a nearby field and kill him.  Jefferson's mother, Syndee, and sister, Rachel, drove up to the location.  Syndee got involved in the fight.  Murphy struck her on the back of the head and she yelled that someone had hit her.  Syndee heard Jackson say, "We'll smoke you like we smoked them Campanellas."[7]  Rachel moved the car and tried to hit Jackson with it.  Jackson ran down the street and Murphy followed.  Jefferson got into his mother's car and the three Jeffersons left.  Jefferson did not see the Ford Escort or his gun again.

According to Jones, defendants left the location on foot and returned in Jefferson's Ford.  They began removing shell casings from the car and wiping down the doors to remove fingerprints.  After cleaning the car, they drove the Ford away.

---

**6**      At trial, Jefferson could not recall if he had left his keys in the car.

**7**      Syndee Jefferson testified that she did not recall hearing that statement.  She stated she was truthful when she first spoke to Detective Zumwalt in October of 2006.  Zumwalt told the jury that Jefferson attributed the statement to Jackson during her recorded interview.

6

On February 28, 2002, Los Angeles Police Officer Mario Cardona and his partner saw a grey Mazda with an inoperative brake light. They attempted to perform a traffic stop, but the Mazda did not pull over. The officers activated the patrol car's lights and sirens. The Mazda did not yield. Cardona turned on a spotlight and illuminated the interior of the Mazda. The driver, Jackson, was looking through the rear view mirror at the officers, and the passenger, Murphy, glanced toward the patrol car and leaned down toward the floor of the Mazda. Jackson made a right turn, drove to the middle of the block, and pulled into a driveway.

Cardona called for backup units and after they arrived, defendants were told to exit the Mazda. They complied. After officers discovered that Jackson was driving with a suspended license, the vehicle was impounded. During an inventory search of the Mazda, a nine-millimeter Glock handgun was found under the passenger seat.

A ballistics expert determined that the eight .45-caliber shell casings found at the scene of the murder were fired from the .45-caliber handgun seized during the search of Nevens's home. The nine-millimeter bullet recovered during Mixon's autopsy and shell casings recovered at the location of the shooting were fired from the weapon recovered from the Mazda in which defendants were stopped by police. The expert examined the Mazda and found no gunshot residue.[8]

In 2002, when the Mixon homicide occurred, Detective Q. Rodriguez was a gang detective assigned to the Tragniew Park Crips. The gang's primary activities include murders, attempted murders, robberies, and narcotics sales.[9] According to Rodriguez,

---

[8]    A fingerprint examiner was unable to lift useable prints from either the nine-millimeter or .45-caliber weapon. He explained there were a number of reasons for this and stated that it was rare for him to find useable prints on firearms and their component parts. The expert was asked about a report prepared by John Green, Murphy's fingerprint expert, that stated the print lifted from the .45-caliber weapon was not Murphy's. The prosecution expert opined the print was of such poor quality that no individual could be excluded as being the source. A second fingerprint examiner called by the prosecution concurred.

[9]    Rodriguez testified to the predicate acts required by the gang statute.

defendants are members of Tragniew Park Crips.  The Campanella Pirus, a Blood gang, is a rival of the Tragniew Park Crips.  Crips denigrate members of a Blood gang by referring to them as "Slobs."

A number of calls defendants made while in custody were recorded.  Rodriguez listened to several of the tapes of Murphy's calls and opined that Murphy:  (1) was aware that Jones and Jefferson would be testifying against him; (2) was concerned that Jefferson in particular was "the problem"; and (3) discussed getting the mother of his child, Tasheen Bradley, to help him by giving certain testimony and acknowledged that he would have to tell her what to say.  The tapes were played for the jury.

Given a hypothetical based on the facts of this case, Rodriguez stated that he believed the shooting of Mixon and Bolton was committed to promote, further, and assist criminal conduct by the Tragniew Park Crips.  His opinion was based on the preoffense statements of defendants that they were going to put in work for the gang and shoot someone in Campanella gang territory and the manner in which the shooting was carried out, as it enhanced the gang's reputation for violence and sent a message to the Campanella gang that the Tragniew gang was responsible.

## II.    The Defense Case

On the day of the shooting, Philip Shivers was living at Vertis Nevens's home. That evening, he returned home from work and saw defendant Jackson.  Shivers was in his room in the back of the house when he heard people arguing.  He went to investigate and saw Glenn Jefferson and someone named Ronald quarreling.  Jackson, Jefferson, Ronald, and Lederrick Jones went outside.  Shivers saw the men shoving each other, but no blows were thrown.  Because the situation was upsetting, Shivers walked down the street and got Nevens to come back to the house to break up the argument.  Shivers did not hear Jackson make any remarks with reference to the Campanella Park Pirus. According to Shivers, the Nevens residence was a "fun house" where guys could "play cards and chess and dominoes."  He denied the home was a hangout for Tragniew Park gang members.

8

Jamal Hakim, also known as Blue Jay, was a sentenced prisoner due to his conviction for possession of narcotics for sale. In February 2002, he was a member of the Tragniew Park Crips. Hakim knows defendants, Vertis Nevens, and Lederrick Jones. Hakim did not recall where he was on the night of February 19, 2002; however, contradicting Jones's testimony, he was not at Vertis Nevens's home, did not accompany Jones to a park, and did not see a fight between Jackson and Glenn Jefferson.

John Treuting is a toxicologist. Toxicology is the study of the adverse effect poisons have on living organisms. Phencyclidine, or PCP, was developed as an anesthetic for animals. It was taken off the market because it caused the animals (and later the humans who tested it) to act very bizarrely. PCP is a hallucinogenic drug. The drug affects people differently; it may act as a depressant on one person and a stimulant on another. Long-term use can cause brain damage.

Treuting reviewed the testimony of Lederrick Jones and Glenn Jefferson. He concluded that Jones was under the influence of PCP on February 19, 2002. Jefferson may have felt the effects of the drug to a lesser extent because he smoked fewer PCP-laced cigarettes that day than Jones.

John Green is a forensic print specialist. Prior to joining the panel of experts for the Los Angeles Superior Court, he worked for the Los Angeles Police Department in the latent print section of the Scientific Investigation Division. Green examined the print lifted from the .45-caliber handgun used in the murder and compared it to Murphy's prints. Murphy's prints and the print from the gun were not from the same individual. Green could not say that Murphy did not touch the gun and acknowledged that it is difficult to leave a print on a firearm.

Dennis Cota is a Los Angeles County Fire Department paramedic firefighter. According to a Department report, he responded to the scene of the shooting on February 19, 2002; however, he had no recollection of the events. The report reflected that a victim was pronounced dead at 9:40 p.m.

Tasheen Bradley has known Murphy since 1994 and they have had a dating relationship. She was with Murphy on December 11, 2002, when the police searched her

9

vehicle and recovered a firearm.  The gun was not hers and Murphy took responsibility for the weapon.

On February 19, 2002, upon leaving work, Bradley picked up Murphy and they went to get their daughter from daycare.  Bradley went to school while Murphy looked after the child.  After class, Bradley, Murphy, and their daughter went out to dinner and drove to Murphy's mother's house to watch movies.  From the time Bradley got out of class at 8:00 p.m. until she left to go to her home at 10:30, Murphy did not leave her side.  On the way home, she dropped Murphy off at a house near where he lived.  Bradley conceded that Murphy had to remind her what they had done on February 19.

Damion Yeargin has known Murphy for over 20 years.  On February 19, 2002, he was present at Vertis Nevens's home.  On that day, Jefferson and Jones were at the house.  Yeargin believed that Jefferson arrived first.  Jefferson and Jones were using cocaine and PCP.  Yeargin heard them bragging about putting in work or busting on some Campanellas.  He said this meant the two men were talking about shooting or taking part in gang activity.  They said the victims deserved what they got.  Yeargin recalled that after these statements were made, Murphy was dropped off at the house by Tasheen Bradley at about 10:00 or 10:30 p.m.  At the time, Yeargin was outside watching a police helicopter that was flying over Campanella gang territory.  Yeargin did not see Murphy with a firearm.  Murphy did not state he had been involved in a crime that had just occurred.

Yeargin said that Jefferson accused Jackson of taking his gun, Jackson denied it, and they got into a fight.  Yeargin recalled that Jefferson's mother appeared, got involved in the fight, and was struck by someone.

Murphy testified.  On February 19, 2002, he and Tasheen Bradley picked up their daughter from daycare at about 3:30 p.m.  They went to his mother's house, where he was living at the time.  They ate, watched a movie, played with their daughter, and had sexual relations.  At about 10:00 or 10:30 p.m., Bradley wanted to leave and he asked her to drop him off at Vertis Nevens's house.  When Murphy arrived, Yeargin was outside.  A helicopter flew overhead and the men went inside.

10

Jefferson entered the residence screaming that he wanted his gun back. He accused Jackson of taking it. A fight ensued. Jefferson's mother appeared; Murphy denied hitting her.

When asked about the nine-millimeter handgun (one of the murder weapons) that was found under the passenger seat of the Mazda stopped by police, Murphy denied placing the weapon there or knowing it was in the car. Murphy acknowledged he had suffered four felony convictions: one for forgery in 1995, one for being a felon in possession of a firearm in 2001 or 2002, one for burglary in 1997, and another for robbery. He had no idea why Lederrick Jones and Glenn Jefferson would accuse him of being involved in the Mixon murder.

## III. The Prosecution's Rebuttal

Detective Zumwalt is a qualified expert in the area of possession of PCP for sale. Often sellers will cut or dilute the drug and the small time buyer is most likely to receive a diluted dose. Addicts will develop a tolerance for the drug. He had personal experience with individuals who were under the influence of PCP and nonetheless were able to participate in controlled buys.

Detective Rodriguez testified about two calls Murphy made in December 2008. On the recordings, Murphy is heard saying that Bradley could not remember the events of February 19, 2002, and that Murphy would have to remind her. Bradley did not realize that she could help him, but he would explain things to her. Murphy suggested that Damion also could help him out.

## IV. The Defense Surrebuttal

The parties stipulated that Tasheen Bradley did not have a criminal record. She acknowledged that Murphy had asked her if she could remember the period from Valentine's Day 2002 until the day a friend was killed on February 26, 2002; however, Murphy did not provide any details of their activities.

11

## DISCUSSION

### I.  Defendants' Speedy Trial Rights Were Not Violated

On November 9, 2010, Jackson filed a motion to dismiss, alleging the delay in filing the complaint and in arraigning him on the charges violated his right to a speedy trial under the state and federal Constitutions.  He noted that the crime was committed in 2002.  However, the complaint was not filed until 2006, and he was not arraigned "until the fall of 2008, over six years after the murder," despite the fact that he was a suspect from the beginning and his whereabouts were known since 2003.  Jackson argued that he had suffered prejudice due to the delay because:  (1) he could not locate Bolton, the victim of the attempted murder; (2) he lost potential witnesses; and (3) he could not contest the traffic stop during which the nine-millimeter handgun was found due to the fact that he could not locate the vehicle.

On December 3, 2010, Murphy filed a motion to dismiss, contending that the delay between the 2006 filing of the complaint and his October 2008 arraignment violated his right to a speedy trial under the state Constitution.  He claimed prejudice due to his inability to locate Bolton, who had told Detective Zumwalt that "Mexicans" had committed the shooting.  Murphy's motion included a declaration from his investigator that set forth her efforts to locate Bolton.

On December 13, 2010, the trial court heard the motion to dismiss.  At the outset, Murphy made it clear that he was complaining only about the delay between the November 2006 filing of the complaint and his October 2008 arraignment.  The prosecutor informed the court that she did not intend to call any witnesses with respect to that two-year period.  Because Jackson contended there was no justification for the delay between the February 2002 murder and the filing of the complaint, the prosecutor called several witnesses.

Detective Q. Rodriguez was working in the gang unit on February 19, 2002, the day he learned of the murder.  Rodriguez was told by a confidential informant that Time Bomb and Stutter Box were responsible for the crime and he relayed this information to

12

the investigating officer, Detective Zumwalt. Rodriguez could not recall when he spoke to Zumwalt. Initially, Rodriguez did not know the identities of Time Bomb and Stutter Box. After learning that the monikers belonged to Jackson and Murphy, Tragniew Park Crip gang members, on November 21, 2003, Rodriguez served search warrants on a number of locations associated with that gang. As a result of the warrants, Rodriguez spoke to Lederrick Jones. Jones told him that a person named Lil Jack Dog, a member of Tragniew Park, had his car and gun taken by Jackson and Murphy, who then left the location. They returned and bragged about shooting some people in Campanella Park territory. Sometime later, Rodriguez determined that Lil Jack Dog was the moniker for Glenn Jefferson and informed Zumwalt of that fact.

Rodriquez and Zumwalt attempted to locate Jefferson. They periodically checked to determine whether Jefferson had contact with police. In October 2006, Rodriguez learned that Jefferson was in custody in connection with another homicide. Rodriguez spoke briefly to Jefferson and his mother and told Zumwalt that Jefferson was in custody and available to be interviewed.

Detective Boyd Zumwalt is the investigating officer in the case. On February 21, 2002, he received information from a gang detective, who told him about an anonymous call concerning the shooting of Mixon and Bolton. The caller said Time Bomb, a Tragniew Park Crip, had done the shooting with a nine-millimeter Glock. Zumwalt knew that nine-millimeter and .45-caliber shell casings were recovered from the scene of the shooting. An informant told Zumwalt in late February 2002 that the shooters were Tragniew Park Crips, but the informant was unable to provide any names.

In March 2002, another homicide investigator told Zumwalt that defendants had been arrested on February 28 and a nine-millimeter Glock was found in their car. On January 29, 2003, Zumwalt learned that the nine-millimeter Glock fired the shell casings left at the location of the murder.

Zumwalt testified about his contact with Roland Bolton. On April 24, 2002, Zumwalt interviewed him. Bolton was not cooperative. He was shown 2 six packs that contained photographs of defendants. Bolton told Zumwalt that Mexicans shot him. In

13

2009, Zumwalt served him with a subpoena to appear for trial. Bolton did not show up and Zumwalt had not seen him since.

In 2003, Detective Rodriguez told him about information Rodriguez had received from an informant. According to the informant, defendants took a car belonging to Lil Jack Dog, shot some people in Campanella Park Piru territory, and returned to brag about it. At that time, Zumwalt did not know who Lil Jack Dog was.

In November 2003, Zumwalt learned that Lederrick Jones had information about the shooting. Detective Rodriguez told Zumwalt that Jones had implicated defendants in the shooting of Mixon and Bolton. Zumwalt knew Jones had been charged in another murder and waited for that case to be completed before speaking to him.

In June 2005, the two detectives interviewed Jones in prison. Jones repeated the story he had told Rodriguez, again stating that defendants took Lil Jack Dog's car and gun and shot the victims in Campanella Park territory. At that point, Zumwalt did not believe he had enough evidence to seek a murder filing because no witness had corroborated Jones's version of events.

On October 10, 2006, Rodriguez told Zumwalt that a person in custody named Glenn Jefferson was the Lil Jack Dog they had been looking for. That day, Zumwalt spoke to Jefferson and his mother, Syndee. They corroborated Lederrick Jones's statement with regard to the February 2002 shooting. Zumwalt also learned that Syndee Jefferson was the anonymous caller in February 2002, who said that Time Bomb was responsible for shooting Mixon and Bolton. Believing there was enough evidence, Zumwalt caused the case against defendants to be filed on November 1, 2006.

The parties stipulated that defendants were arraigned in October 2008. The prosecutor presented evidence showing that the Mazda in which defendants were stopped and the nine-millimeter handgun was recovered was destroyed on March 26, 2003.

The prosecutor argued the prefiling delay was justified due to the fact that Lederrick Jones could not be interviewed until his criminal matter was resolved. She acknowledged that Roland Bolton was not available as a witness. However, she argued, because he had been uncooperative from the outset, it was difficult to conclude that the

14

passage of time was the reason for his absence. He had been subpoenaed for the first trial and refused to appear. She observed that a defense investigator went to the residence where Bolton was purported to live and contacted a male who was hostile and declined to identify himself. The prosecutor surmised the male may have been Bolton.

Jackson contended the prosecution could have interviewed Jones earlier. He was sentenced on his matter in February of 2004 and was not interviewed until June of 2005. Jackson asserted the prefiling delay led to the unavailability of one of the officers involved in the traffic stop of defendants that led to the discovery of the nine-millimeter Glock. In addition, Jackson was unable to locate the owner of the Mazda, who was necessary to refute the officer's claim that the tail light was not operating.

The prosecutor responded that Jones could not be interviewed until Jackson's other murder trial was completed. Jones was a witness in that case and faced the possibility of testifying in the event Jackson's new trial motion was granted. That was the state of affairs until Jackson was sentenced in March of 2005. Detectives interviewed Jones three months later.

Murphy reiterated that Bolton was key to defendants' case, as he had told police that he had been shot by Mexicans. Murphy also claimed he had lost the opportunity to receive concurrent time with another sentence he was serving.

The trial court concluded that the prefiling delay was justified. With respect to the prearraignment delay, the court found defendants had suffered slight prejudice in that they were having difficulty locating Roland Bolton. However, it observed that Bolton had been available and was served in 2009. In addition, Murphy's investigator had found a male at Bolton's home. The court stated it was unclear whether the male was Bolton. It denied the motion.

Defendants contend their right to a speedy trial was violated in two ways: (1) the prosecution improperly delayed filing the case for the February 2002 murder until November 2006; and (2) the prosecution waited two years before having defendants arraigned in October 2008. For the following reasons, we disagree.

15

"A defendant seeking relief for undue delay in filing charges must first demonstrate resulting prejudice, such as by showing the loss of a material witness or other missing evidence, or fading memory caused by the lapse of time. [Citation.] Prejudice to a defendant from precharging delay is not presumed. [Citations.] . . . If the defendant establishes prejudice, the prosecution may offer justification for the delay; the court considering a motion to dismiss then balances the harm to the defendant against the justification for the delay. [Citation.] But if the defendant fails to meet his or her burden of showing prejudice, there is no need to determine whether the delay was justified. [Citations.]" (*People v. Abel* (2012) 53 Cal.4th 891, 909.) A defendant is also obligated to affirmatively demonstrate prejudice to establish a speedy trial claim for delay occurring after the filing of a felony complaint but before the attachment of statutory speedy trial rights. (*People v. Martinez* (2000) 22 Cal.4th 750, 768.)[10] With this background, we examine whether defendants demonstrated that they suffered any prejudice resulting from the delay.

Defendants claim the delay led to the loss of a crucial witness, Roland Bolton. If, they assert, he had been located, he would have testified that Mexicans were responsible for the shooting that led to Mixon's death and his injuries, as he had told police. Even if true, defendants have failed to establish that their inability to obtain Bolton's testimony was the result of any delay. Bolton was located after defendants were arraigned in October 2008. He was subpoenaed in July 2009 for the first trial and failed to appear. Murphy argues that if the case had proceeded in a timely fashion in 2006, following the filing of the complaint, Bolton may have been willing to appear in court. We do not agree.

Detective Zumwalt attempted to speak to Bolton at the hospital after the shooting. Even at that early stage, Bolton was an uncooperative witness. Zumwalt assumed the

---

[10]     Because California's speedy trial right is at least as favorable to defendants as the law under the United States Constitution, which may require a showing that the authorities delayed in order to gain a tactical advantage, we will apply California law. (*People v. Abel*, *supra*, 53 Cal.4th at p. 909, fn 1.)

shooting was gang related because Bolton's attitude mirrored that of other witnesses in gang cases who refuse to speak to police. There is nothing in the record to suggest that Bolton would have been a willing witness had the trial commenced sooner. His refusal to obey the 2009 subpoena supports the contrary conclusion.

In addition, there was evidence demonstrating that the defense could have located (or possibly did locate) Bolton prior to the second trial. Murphy's investigator filed a declaration with the court stating that she: (1) found an address for Bolton; (2) went to the address on April 22, 2010, and made contact with a "hostile male occupant who refused to give his name or any information about Roland Bolton. However, he did state that Roland Bolton was a resident and that he would tell him to call me"; (3) returned to the address on May 20, 2010, and spoke to the same male, who again confirmed that Roland Bolton was a resident at that address and said he would tell Bolton to contact her; and (4) confirmed that Bolton was not in custody or hospitalized. This declaration was signed on June 11, 2010. There is nothing in the record showing that any further attempts to contact Bolton occurred between June 11, 2010, and January 20, 2011, the day the jury panel was sworn. Thus, as late as June 2010, the defense knew where Bolton lived, and there is no evidence that he moved prior to the commencement of trial. Given these facts, defendants are incorrect when they assert that the passage of time made it more difficult to secure Bolton. More accurately, he simply was a witness who refused to cooperate and demonstrated a continuing willingness to avoid taking part in the judicial process, however long it took to play out.

Defendants also complain that the delay caused the car in which they were stopped to be lost. Without the vehicle, they argue, there was no way to dispute the police claim that a tail light was not operating. Defendants have made no attempt to explain why this is so. The owner of the vehicle could have shed light on the condition of the vehicle. Although Jackson suggested in the trial court that he had difficulty locating the owner, on appeal defendants do not attempt to establish that this witness was unavailable. Even assuming it was crucial for defendants to have the car to contest the search (a speculative proposition given that the vehicle was towed and left in a yard for over a year until it was

17

destroyed, thereby compromising any evidentiary value it may have had), the police first obtained evidence showing the possible involvement of defendants in the shootings in November 2003, when Lederrick Jones told Detective Rodriguez that they were responsible. The car was destroyed in March 2003. The loss of the car was not caused by an unreasonable delay. Defendants also claim they suffered prejudice from the absence of the second officer involved in the stop. The other officer, Mario Cardona, testified at the suppression hearing. Defendants had every opportunity to cross-examine the officer and vigorously litigate their motion. They give no reason, such as an offer of proof, for concluding that the second officer was necessary.

Next, defendants contend they were prejudiced because the delay led to the loss of a photograph showing Vertis Nevens holding the .45-caliber handgun that was one of the murder weapons. We are not persuaded. First, Deputy Houle testified, without contradiction, that he recovered the photograph at the March 2002 search of Nevens's home. He said the photograph showed Nevens holding the weapon in his right hand, with his arm across his chest, pointing it at the ceiling at a 45-degree angle. Houle was "100 percent positive" that the weapon in the picture was the same .45-caliber handgun recovered from the home and determined to have been used in the shooting. Defendants offer no support for their claim that "the impact of the actual photograph would have been far greater." Second, no one disputed that the weapon was found in Nevens's bedroom. Thus, the photograph was merely cumulative to the points defendants had already established, those being that Nevens possessed the .45-caliber handgun and it was found in his bedroom approximately one month after the shooting.

Our analysis is not changed by defendants' reliance on Lederrick Jones's testimony at the preliminary hearing. He stated that defendants and Nevens returned to Nevens's house in Jefferson's car. This, defendants argue, was after the shooting occurred and supports the theory that it was Nevens who shot the victims. The flaw in their argument is that possession of the murder weapon at some unknown point in time, which is all the photograph depicts, does little to prove that Nevens used the firearm on

18

February 19. In the absence of any other evidence tying Nevens to the shooting, the evidentiary value of the missing photograph was minimal, at best.

Murphy argues that the passage of time caused him to lose the ability to fully prepare his defense. Initially, he concedes that in the trial court he was unable to identify any witnesses that, but for the delay, he could have called to support his defense. This alone is fatal to his claim. He had "the burden to affirmatively demonstrate that the delay prejudiced his ability to defend against the charge." (*People v. Contreras* (2009) 177 Cal.App.4th 1296, 1305.)

On appeal, Murphy still does not present an offer of proof regarding the witnesses he allegedly lost due to the delay. He now argues that he was prejudiced because his alibi was based on the fact that he and his girlfriend were at a restaurant at or around the time of the shooting. He complains that he was unable to substantiate his alibi by locating restaurant employees who may have seen him on the night in question, a receipt from the restaurant, or a surveillance video that could have verified his presence. Murphy submits nothing showing that the delay caused the loss of such evidence. He does not give the slightest suggestion that he attempted to return to the restaurant and was unable to find evidence due to the passage of time. The truth is that he was able to present his and Tasheen Bradley's detailed testimony as to Murphy's whereabouts from the afternoon of the day of the shooting until 10:00 or 10:30 p.m., when Bradley dropped Murphy off at Nevens's home. (Mixon was declared dead at the scene at 9:40 p.m.) In addition, Damion Yeargin testified that Jefferson and Jones spoke about shooting some Campanella Park members, not Murphy. He also verified that Murphy arrived at Nevens's home between 10:00 and 10:30 p.m., saying he saw Murphy being dropped off by Bradley. On this record, Murphy has failed to establish that any delay prevented him from presenting a defense.

In his opening brief, Murphy argues that due to the delay, he lost the ability to receive concurrent sentences. However, as the Attorney General points out, Murphy was sentenced pursuant to the Three Strikes law. Because Murphy's crimes (the robberies for which he was previously sentenced and the shootings committed in the present case)

19

were not committed on the same occasion and did not arise from the same set of operative facts, the trial court was required to impose consecutive sentences. (§§ 667, subd. (c)(6), 1170.12, subd. (a)(6).) In his reply brief, Murphy concedes the Attorney General is correct.

Finally, in order to preserve the issue for federal review, Murphy raises the contention that the filing of the complaint triggered his Sixth Amendment right to a speedy trial. He concedes that we are bound by the Supreme Court's contrary conclusion in *People v. Martinez*, *supra*, 22 Cal.4th at pp. 758-765. (*Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

## II. Defendants Failed to Make an Adequate Record Demonstrating the Presence of Police Officers in the Courtroom Denied Them a Fair Trial

The jury panel was sworn on January 20, 2011. Jury selection, opening statements, and testimony ensued. On February 7, before the morning proceedings began, the court advised defendants that the trial had to be moved to another courtroom because of a "facility problem." Before the afternoon session, Jackson objected to the "high police presence in the courtroom" during the trial. Claiming it was distracting to him and perhaps the jury, Jackson stated, "Because you had mentioned in voir dire that it would be, like, three or four. And I think I counted about eleven or twelve officers in here, Your Honor. I think that it has become a problem. My family is being kicked out and stuff like that."

The court responded that it did not know what Jackson meant when he claimed his family was being kicked out. It asked Jackson whether he wanted to put anything else on the record. Jackson declined. Murphy joined in the objection.

Two days later, Jackson again broached the subject of the presence of officers. Referring to his earlier objection, he informed the court that a witness had informed him

20

that there may have been an improper conversation between law enforcement and the jury. For that reason, Jackson moved for a mistrial.[11]

The issue did not come up again until after the court trial on the priors. The prosecutor stated: "Mr. Murphy — or Mr. Jackson had stated that there were all these officers in court and stated some high number. I didn't interrupt them at the time. But I just wanted for the record on appeal that I 100 percent disagree with that when Mr. — I think it was Mr. Jackson said he counted eleven cops —." The court interrupted and stated it did not want to get into another topic. The prosecutor continued, "Okay. I just want to say I disagree with that. I counted and I didn't come to the same number. It was significantly less."

Initially, we note that the record does not set forth with any degree of specificity how many officers were in the courtroom at any given time. Jackson said, "I *think* I counted *about eleven or twelve officers*" in the courtroom. (Italics added.) The prosecutor disagreed, saying she counted "significantly less." Nor does the record indicate whether the officers in the courtroom were armed and in uniform. That fact is important because a jury cannot be prejudiced if it is unaware that an individual in the courtroom is an officer. (See *People v. Ainsworth* (1988) 45 Cal.3d 984, 1003-1004 [the number of armed, uniformed deputies in the courtroom did not deny defendant due process]; *Holbrook v. Flynn* (1986) 475 U.S. 560, 570 ["The only question we need answer is thus whether the presence of these four uniformed and armed officers was so inherently prejudicial that respondent was thereby denied his constitutional right to a fair trial."].) In addition, the record does not reflect where the officers were situated in the courtroom. Did Jackson count Detective Zumwalt among the officers he saw in the courtroom? Zumwalt was the investigating officer and sat at counsel table. Defendants do not explain how his presence was prejudicial. Most significant, the record does not establish whether the jury was in the courtroom at the time Jackson allegedly counted

---

[11]     Because defendants do not raise a claim of juror misconduct or contend the mistrial motion on that ground was improperly denied, we do not set forth the court's inquiry in response to Jackson's motion.

about 11 or 12 officers.  There were a number of motions heard during the trial without the jury.  We do know, from the record, that when Jackson made the statement referring to the number of officers in the courtroom, the jurors were not present.

Defendants bear "the burden to provide a record on appeal which affirmatively shows that there was an error below, and any uncertainty in the record must be resolved against" them.  (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 549.)  This obligation means that "during trial, the parties must ensure that an adequate record is made of errors by which they are or may be aggrieved; ordinarily, errors not reflected in the trial record will not, and indeed cannot, sustain a reversal on appeal."  (*Yield Dynamics*, *Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 557.)  Here, defendants could have made an adequate record by simply asking the trial court to confirm the number of armed, uniformed officers who were present in the courtroom while the jurors were present.  By failing to make a record sufficient to review their claim of error, defendants forfeited the contention.  (See *People v. Morris* (2003) 107 Cal.App.4th 402, 409 [defendant failed to make a record from which appellate court could determine which of the challenged jurors were the subject of his *Wheeler*[12] motion and forfeited his claim of error].)

## III.    Jackson's Claim Relating to the Use of His Gang Moniker Was Forfeited

While conceding that a court may properly admit evidence of a gang moniker, Jackson asserts the prosecutor's excessive use of his moniker, Time Bomb, violated his right to due process.  We conclude he forfeited the contention by failing to lodge an objection in the trial court, much less a specific objection citing the constitutional ground he raises on appeal.

In his opening brief, Jackson states that he objected to the use of his gang moniker, citing several portions of the record.  We have reviewed the record cites and he is mistaken.  The first citation establishes that he was objecting to the admission of photographs of his gang tattoos.  He asserts that the motion seeking the exclusion of his

---

[12]    *People v. Wheeler* (1978) 22 Cal.3d 258.

tattoos also referred to the use of his moniker. He is incorrect. Nowhere during that discussion did Jackson mention the words "Time Bomb" or moniker or request that the prosecutor be barred from using his gang name. Indeed, Jackson's second citation to the record makes it clear that the trial court denied Jackson's motion to bifurcate the gang allegation and to exclude any reference to his gang tattoos and nothing more. Even if we were to conclude that Jackson raised a generic objection with respect to the use of his gang name, he had an obligation to preserve his constitutional claim by identifying that ground in his objection to the trial court. His failure to do so results in a forfeiture of the claim on appeal. (*People v. Riggs* (2008) 44 Cal.4th 248, 292.)

We agree with Jackson that he complained about the use of his gang moniker when he requested transcripts in order to prepare a motion for new trial. At that point, it was too late.

## IV. Jackson Was Not Prejudiced by the Admission of Murphy's Statements

The prosecution sought the admission of a number of recorded statements made by Murphy. The court allowed the evidence and instructed the jury it was to consider that evidence only against Murphy and not Jackson. Jackson urges that his due process right to a fair trial was violated by the admission of Murphy's statements.

At trial, when the parties and the court discussed the admissibility of Murphy's statements, Jackson objected on two grounds. One, he claimed their admission violated the *Aranda-Bruton*[13] rule that applies to the admission of a codefendant's confession. Two, he argued the evidence was inadmissible under Evidence Code section 352, as it was prejudicial and time consuming. Jackson did not lodge an objection on the specific ground he now raises on appeal—the evidence violated his constitutional right to a fair trial. As a result, he has forfeited the contention. (*People v. Riggs*, *supra*, 44 Cal.4th at p. 292.) In any event, the court did not err by admitting the evidence.

---

[13] *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123.

23

In his opening brief, Jackson sets forth the evidence at length. A review of the statements reveals that Jackson was mentioned only once. Murphy told his mother that Jackson was "straight." In his testimony, Murphy explained he meant that he knew Jackson would not try to frame him for a crime he did not commit. Notwithstanding Murphy's singular reference to Jackson in the recorded conversations, Jackson contends he was prejudiced because the prosecutor constantly elicited testimony from witnesses that he and Murphy were inseparable. Due to Murphy's multiple statements regarding the potential witnesses in the case and the admission of a detective's misinterpretation of another conversation Murphy had with others in a van upon his arrest, Jackson asserts, "no juror could have possibly drawn any conclusion other than if Murphy was conscious of guilt, [he] was too." We reject this speculative claim.

With respect to Murphy's statements, the court instructed the jury as follows:

"You have heard evidence that Devin Murphy made statements out of court[:]

"1.    heard by L[e]derrick Jones;

"2.    to individuals inside of a custody van that was recorded; and

"3.    to numerous persons using a pay phone which were recorded.

"You may consider that evidence only against Mr. Murphy, not against Demoria Jackson."

The court went on to inform the jury that it could not use any statement made by Jackson against Devin Murphy.

"We 'credit jurors with intelligence and common sense' [citation] and presume they generally understand and follow instructions [citation]." (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.) The cited instruction regarding the use of Murphy's statements could not be any clearer. Jackson's theory that because witnesses said he and Murphy were close, the jury must have ignored the court's instruction and concluded that Murphy was speaking for Jackson, who was neither present nor (with the one exception) referred to, is based wholly on conjecture. Unlike other situations where attorneys have misstated the law and potentially confused the jury, the prosecutor here said in argument, "At least with respect to Mr. Murphy — I'm only talking about him when I'm talking

24

about these phone calls, this van conversation. You can't use the van conversation — or actually any of Mr. Murphy's phone calls against Mr. Jackson. You cannot do that." "Absent some contrary indication in the record, we presume the jury follows its instructions [citations] 'and that its verdict reflects the legal limitations those instructions imposed' [citation]." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803-804.) That presumption applies here.

Jackson also complains that the evidence should have been excluded under Evidence Code section 352 because it was unduly prejudicial. As we have concluded that the jury understood it was not to use Murphy's statements in evaluating Jackson's guilt, Jackson could not have been prejudiced by their admission. To the extent he is arguing that Detective Rodriguez's interpretation of Murphy's statements should have been excluded because it was misleading, he forfeited that contention by not raising it below. Moreover, on the merits, Jackson's claim is unavailing. It was up to the jury to determine whether the detective's interpretation was accurate. In that regard, the jury was instructed that it was not required to accept an expert's opinion as true or correct and free to reject an opinion if it was unbelievable, unreasonable, or unsupported by the evidence. Again, we may presume the jury followed the court's instruction. The admission of Murphy's recorded statements did not prejudice Jackson.

**V.    Defendant's Claim That Roland Bolton's Out-of-Court Statement Was Improperly Excluded Was Forfeited**

On two occasions, after the incident and while viewing photo lineups, Roland Bolton told officers that he was shot by Mexicans. After the parties were unsuccessful at securing Bolton's attendance at trial, defendants attempted to admit those out-of-court statements. The court sustained the prosecutor's hearsay objection. Defendants argue they were denied their constitutional right to present a defense as a result. They forfeited the contention by failing to lodge an objection on federal constitutional grounds in the trial court.

25

Prior to trial, the prosecutor asked that Bolton's statements be excluded. The court granted the request without objection. Later, during trial, Murphy sought to utilize Bolton's statement to Detective Zumwalt, arguing it was admissible as former testimony. (Evid. Code, §§ 1291 & 1292.) After the court explained that Bolton had not testified in a prior proceeding, Murphy objected "under [Evidence Code section] 353." No further grounds were stated by either defendant. Their failure to object in the trial court on the constitutional grounds they now raise results in a forfeiture of the claim. (*People v. Riggs*, *supra*, 44 Cal.4th at p. 292.)[14]

## VI. The Abstract of Judgment Must Be Corrected

In their opening briefs, defendants claimed they were entitled to additional presentence custody credits. After the Attorney General's brief cited *People v. Gisbert* (2012) 205 Cal.App.4th 277, 281, for the proposition that defendants were not entitled to any presentence custody credits because they were already incarcerated as a result of a sentence in another case, defendants conceded the Attorney General was correct. The concession was appropriate. At the time of their arrest on this case, defendants were serving prison sentences imposed for other offenses, and *Gisbert* holds they were not entitled to presentence custody credits for the present offense. (*Ibid.*) We agree. And, as discussed above, because defendants had suffered a prior serious felony conviction, the court was required to impose consecutive sentences. (§§ 667, subd. (c)(6), 1170.12, subd. (a)(6).) The abstracts of judgment must be amended to reflect that each defendant's sentence is to be served consecutively.

At sentencing, the court ordered defendants to pay direct victim restitution and made the obligation joint and several. The parties agree that the abstract of judgment must be changed to reflect the oral pronouncement of judgment. We agree. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [abstract of judgment may not modify court's oral pronouncement of judgment].)

---

[14] As we have concluded no error was committed during the trial, defendants' claim of cumulative error necessarily fails.

## DISPOSITION

The clerk of the superior court is directed to prepare an amended abstract of judgment for each defendant to reflect that: (1) each is awarded no presentence custody credits; (2) each of their sentences is to be served consecutively to any other sentence previously imposed; and (3) each defendant's liability for victim restitution is joint and several. The clerk is to forward a copy of the amended abstracts to the Department of Corrections and Rehabilitation. As modified, the judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

SUZUKAWA, J.

We concur:


WILLHITE, Acting P.J.


MANELLA, J.